# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRADY P., by Beth and Kevin P.,** | : | **CIVIL ACTION NO. 1:16-CV-2395** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CENTRAL YORK SCHOOL** | : | |
| **DISTRICT,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Minor plaintiff Brady P. ("Brady"), by and through his parents Beth and Kevin P. ("Parents"), filed the above-captioned action alleging that defendant Central York School District ("School District") violated the Individuals with Disabilities Education Act ("IDEA"), as amended, 20 U.S.C. § 1400 *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), as amended, 29 U.S.C. § 794, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Early Intervention Services System Act, 11 PA. STAT. AND CONS. STAT. ANN. § 875-101 *et seq.*, and 22 PA. CODE §§ 14.131 to 14.133. (See Doc. 1). Parents appeal the decision of Pennsylvania Special Education Hearing Officer Cathy A. Skidmore ("Hearing Officer") that (1) Parents knew or should have known there were deficiencies in Brady's education on March 5, 2013; and (2) Parents' June 3, 2016 due process complaint was untimely filed, entitling Brady to relief for only the two year period preceding the due process complaint. Presently before the court are Parents' motion (Doc. 17) for judgment on the administrative record and the School

District's motion (Doc. 19) for summary judgment. After thorough review of the record, the court will deny Parents' motion and grant the School District's motion.

## I. Background

### A. Factual Background[1]

Brady is a fourteen-year-old student who at all times relevant was a resident of the School District. (H.O.D. ¶ 1; N.T. at 45-46). Parents engaged a private psychologist to evaluate Brady prior to his enrollment in the School District for kindergarten. (H.O.D. ¶ 3; Doc. 1 ¶ 19). The psychologist's February 20, 2009 evaluation concluded that Brady presented with Pervasive Developmental Disorder-Not Otherwise Specified ("PDD-NOS"),[2] Attention Deficit Hyperactivity Disorder ("ADHD"), Developmental Coordination Disorder, and a language disorder. (S-9 at 1-3). According to the report, Brady's language disorder manifested through difficulties with verbal expression, word retrieval, and language processing. (Id. at 3). He was also "at risk for [a] learning disability in written expression" and exhibited perseveration and illogical thinking when not focused.

---

[1] Citations to the record include the Hearing Officer's September 4, 2016 decision (Doc. 7-3 ("H.O.D.")); the notes of testimony from August 16, 2016 (Doc. 7-2 ("N.T. __")); plaintiff's exhibits (Doc. 7-14 ("P-")); and the School District's exhibits (Docs. 7-4 to 7-13 ("S-")).

[2] The 2009 report notes that Brady presented with PDD-NOS which includes some symptoms of autism, "but not enough to meet diagnostic criteria for autism." (S-9 at 1). A later report identified Brady as having an "Autistic Spectrum Disorder[]." (S-11 at 4). The court observes that the record is replete with references to Brady's "autism" and recognizes that such terminology represents Brady's PDD-NOS diagnosis. For the sake of clarity, we will adopt the terminology of the parties and multiple evaluators, and we will refer to Brady's PDD-NOS diagnosis as autism.

(Id. at 2).  The evaluation recommended support services for Brady through an individualized education program ("IEP") focusing on "attention, language, writing, and social weaknesses."  (Id. at 3).

Ostensibly, the School District was slow to recognize Brady's disabilities. (N.T. at 48, 148-50).  Parents responded by retaining an attorney.  (Id. at 48, 79-80, 149-50).  Upon receipt of correspondence from Parents' attorney, the School District conducted an evaluation of Brady on September 17, 2009 to assess his educational needs.  (Id. at 149; S-4).  Thereafter, the School District determined that Brady was eligible for special education services to address speech and language impairments secondary to his autism.  (S-4 at 7).  Parents approved a September 24, 2009 notice of recommended educational placement for itinerant speech and language support services, (S-15 at 1-3), and worked collaboratively with School District staff and administrators to develop Brady's IEP,[3] (see S-23).

In the spring of 2010, driven by concerns over Brady's persistent attention deficits, Parents obtained an independent psychological evaluation by Vincent Monastra ("Dr. Monastra").  (S-10).  In a report dated May 14, 2010, Dr. Monastra diagnosed Brady with ADHD and PDD-NOS.  (Id. at 8).  He recommended revisions to Brady's educational treatment plan.  (Id. at 8-9).  The School District reevaluated Brady on September 21, 2010 in response to Dr. Monastra's diagnosis and in preparation for the new school year.  (See S-6).  The September 2010 report

---

[3] An IEP team typically consists of the student's parents, regular education teacher, special education teacher, principal, and to the extent necessary, additional professionals with an overarching goal of meeting the student's educational and related social needs.  (See, e.g., S-23 at 2).

concluded that Brady was performing at grade level academically in reading, writing, and mathematics. (Id. at 4). This report also concluded that Brady remained a suitable candidate for special education services to address his autism and his speech and language impairments. (Id.)

Brady's first grade IEP responded to the two 2010 evaluations by including program modifications and specially designed instruction to assist him in processing directions and information. (S-24). At the conclusion of his first grade year, the School District reported that Brady met district standards in reading, writing, speaking and listening, and mathematics. (See S-7 at 3; S-32 at 6-7). Brady's teacher encouraged Parents to continue working with him over the summer on reading expression and comprehension, story writing, and mathematical concepts. (S-32 at 8).

In June 2011, Dr. Monastra met with Parents for a consultation to assess Brady's progress since the May 2010 evaluation. (See S-11). The consultation report reflected improvements in Brady's attentiveness and responsiveness to instructions and conversations. (Id. at 1). However, Dr. Monastra also identified multiple, persistent developmental concerns—namely, Brady was easily distracted, struggled to follow multi-step directions, and experienced reading and listening comprehension challenges. (Id. at 2).

      1.    *Second Grade*

Brady entered second grade in the fall of 2011. (H.O.D. ¶ 18). In his September IEP, Brady's mother observed that Brady was struggling to respond to questions, to carry on a conversation, and to process information. (S-25 at 8). His

mother also identified disfluencies in Brady's speech, his difficulty organizing thoughts, and his trouble with short term memory and written expression. (Id.) In its contribution to the IEP, the School District observed that Brady needed to improve his social skills. (Id.) The September 2011 IEP maintained specially designed instruction as well as itinerant speech and language support for 30 minutes a week outside the regular classroom setting. (Id. at 19-20, 22-23).

School District psychologist Jessica Molinero ("Dr. Molinero") administered two evaluations to Brady in October 2011: a psycho-educational evaluation and a speech and language evaluation. (N.T. at 75-76, 317; S-26 at 9-12). Thereafter, the School District issued a new report which determined that Brady remained eligible for special education services based upon autism and speech and language impairments. (S-8). The October 2011 report further concluded that Brady's current instructional setting and protocol were sufficient to meet his needs. (Id. at 11). Brady's IEP team revised the IEP on November 17, 2011 following a team meeting. (See S-26). Parents approved a notice of recommended educational placement to continue itinerant speech and language support services. (S-15 at 4-6). Brady's year-end report card indicated that he met all district benchmarks in reading, speaking and listening, and mathematics as well as most writing standards. (S-32 at 10-11).

### 2. *Third Grade*

Brady began third grade in September 2012. (H.O.D. at 5). His November 2012 IEP reflected Parents' concerns regarding Brady's spelling and reading fluency. (S-27 at 8). The November 2012 IEP also identified Brady's ongoing

challenges with social skills, including communication with peers and adults and thought organization. (Id.) Brady's mother requested that the School District evaluate Brady for a reading disability. (Id.; N.T. at 152-53). When the School District denied her request, Brady's mother hired private psychologist Daniel H. Ingram ("Dr. Ingram") to evaluate Brady because she believed the School District may have failed to diagnose dyslexia. (N.T. at 75, 152-53, 168-69, 205-06).

Dr. Ingram evaluated Brady on December 8, 2012. (S-12). The psychological evaluation noted Brady experienced significant delays in written expression secondary to learning disability dysgraphia. (Id. at 4-5). Dr. Ingram also determined that Brady presented with dyslexia and consequently struggled with phonics skill development, which contributed to a diminished reading accuracy of narrative passages. (Id. at 5). Parents requested an IEP team meeting to discuss Dr. Ingram's findings. (P-10 at 13). In the interim, Parents asked then Principal Ryan Billet ("Principal Billet") to conduct an occupational therapy evaluation of Brady. (N.T. at 71). The School District declined to administer the requested evaluation. (H.O.D. ¶ 27; N.T. at 71, 73).

Brady's IEP team met on March 5, 2013 to discuss the December 8, 2012 psychological evaluation. (P-9 at 1; N.T. at 87, 418-19). Parents invited Dr. Ingram to attend the meeting. (N.T. at 88). Dr. Ingram discussed his findings and informed the IEP team that Brady presented with characteristics of dyslexia. (Id.) Dr. Ingram stated that "because of Brady's age, there would be a five percent chance that Brady would be a competent reader and writer." (Id.) Dr. Ingram purportedly opined that had the characteristics of dyslexia been identified earlier, "[Brady's]

brain could have been rewired." (Id.) Following the meeting, Principal Billet purportedly called Brady's mother to apologize and he allegedly stated that he and Dr. Molinero "couldn't believe that they had missed this." (Id. at 88-89). Following the March 2013 meeting, the School District agreed to purchase a systematic research-based instruction program for Brady called "Wilson." (Id. at 89-90, 94, 264-65, 273-74, 438-39; P-10 at 19-20; S-28 at 21). Wilson addresses student deficits in phonetic skills. (S-28 at 21).

The School District assigned Debra Hicks ("Hicks") to administer Wilson instruction four days per week for 30 minutes. (P-4; N.T. at 267-69, 273-74). Prior to her assignment, Hicks had not received formal Wilson training. (N.T. at 264-65, 273-75). Throughout the spring of 2013, Parents once again expressed concerns that Brady was struggling with reading because of a learning disability. (P-10 at 14, 16, 19-20). According to plaintiffs, the School District declined to identify or to evaluate Brady for dyslexia. (See N.T. at 444-45; S-41 at 16; P-10 at 17-18). Brady's third grade report card reflected that he met all district standards in reading, writing, speaking and listening, and mathematics by the end of the school year. (S-32 at 14-15). The report card identified several areas in need of improvement including, *inter alia*, self-monitoring and self-correction when reading and providing details and applying spelling strategies when writing. (Id.) Parents contemplated withdrawing Brady from the School District in May 2013 because he was exhibiting behavioral problems. (N.T. at 72).

### 3.   *Fourth Grade*

Brady entered the fourth grade in the fall of 2013. (H.O.D. at 6). The School District's reading specialist, Elizabeth Zimmerman ("Zimmerman"), provided Wilson instruction to Brady beginning in October 2013. (N.T. at 339-43). Zimmerman had completed formal Wilson training. (Id. at 356). Brady received 25 minutes of Wilson daily. (Id. at 131, 342; P-10 at 34; S-41 at 22; S-43 at 117). Brady would occasionally miss a day of Wilson instruction, (P-9 at 13; N.T. at 121-22, 131, 343, 356; S-41 at 22), but Zimmerman often extended sessions to accomplish unfinished goals, (N.T. at 343).

Parents continued to express concerns about Brady's reading and writing skills, particularly fluency. (S-41 at 22). Zimmerman observed no fluency issues during the Wilson instruction sessions. (Id.) Parents also continued to report that Brady struggled with social skills. (Id.) The November 2013 IEP acknowledged Parents' worries regarding Brady's working memory, ability to process expressive language, reading fluency and ability to comprehend text at a fourth grade level, and social skills. (S-29 at 8; S-57). The IEP reported improvements in social interactions, speech, and language, and highlighted that Brady excelled at mathematics. (S-29 at 6-8). Brady's ongoing struggles with writing, his lack of focus, and his inability to process "why" questions and verbal directions were also highlighted in the IEP. (Id. at 6, 8). Although Brady used a dictation program and iPad in the classroom to assist with writing activities, the IEP stated that he did not have assistive technology needs. (P-10 at 24-25, 43; S-29 at 5, 8). Program modifications and specially designed instruction included, *inter alia*, improving

focus and task completion, use of an iPad for written assignments, and Wilson instruction for a minimum of 60 minutes per week. (S-29 at 17-20). Parents approved a November 7, 2013 notice of recommended educational placement for continued itinerant speech and language support services. (S-15 at 7-9).

Throughout the fourth grade year, Parents and Brady's teachers communicated frequently about Brady's progress and areas of continued concern. (N.T. at 95, 195). Brady's mother recommended additional programs to the School District to address Brady's challenges with reading and writing. (Id. at 122-24). In March 2014, she also provided examples of Brady's lack of work completion and the decrease in work quality observed at home. (Id. at 446-47). Brady's fourth grade report card reflected that he met district standards in nearly all subcategories of written and oral communication, mathematics, and reading by the end of the school year. (S-32 at 17-19). In addition to deficiencies in self-discipline, the report card noted writing weaknesses including paragraph detail and application of conventions, and a reading weakness in supporting answers using text citations. (Id. at 17, 19). Brady's last day of fourth grade was June 5, 2014. (N.T. at 33-35).

### 4. *Post School District Enrollment*

In the spring of 2014, Parents began exploring alternative schooling options for Brady. (Id. at 50-52). Parents cited Brady's unhappiness with his fourth grade program at the School District and his increasing behavioral problems as reasons for the transfer. (Id. at 50, 63). Parents withdrew Brady from the School District on June 6, 2014 and enrolled him in a private cyber charter school, Commonwealth Connections Academy ("charter school"). (S-43 at 3; S-44; N.T. at 54).

The charter school implemented an IEP for Brady at the beginning of his fifth grade year. (N.T. at 56). Brady's mother testified that Brady was unable to read or understand a textbook, struggled with context clues including margin notes and bolded words, and experienced difficulty writing coherent and grammatically correct sentences. (Id. at 55). Brady's September 2014 IEP identified communications and assistive technology needs and provided itinerant learning support and speech and language therapy. (S-49 at 4-6, 18). Program modifications and specially designed instruction included administration of Wilson instruction on a daily basis as needed. (Id. at 15-16). The charter school issued an evaluation report for Brady on November 11, 2014. (S-45 at 1). The report reiterated Brady's existing autism disability with a secondary disability of speech and language impairment and identified him as eligible for special education. (Id. at 1, 11).

Brady was evaluated by private psychologist Margaret Kay ("Dr. Kay") on November 12, 2015 during sixth grade. (S-13 at 1, 38). Dr. Kay concluded Brady was eligible for special education under several disability classifications including, *inter alia*, autism, ADHD, and specific learning disorders with impairment in sight word identification skills (dyslexia) and written expression (dysgraphia). (Id. at 25, 39). The charter school subsequently issued a new evaluation report on January 22, 2016 that identified Brady's specific learning disability in written expression. (S-46 at 3).

### B.     The Hearing Officer's Decision

Parents filed a due process complaint on June 3, 2016. (Doc. 7-15). Parents' primary assertions in this dispute are twofold: *first*, that the School District failed to

provide Brady with a free, appropriate public education ("FAPE") in several areas:
(1) written expression (second through fourth grade); (2) social skills and
communication (third and fourth grades); (3) occupational therapy (third and fourth
grades); (4) writing, reading, and spelling (third and fourth grades); and (5) assistive
technology (fourth grade), (H.O.D. at 1); and *second*, that the School District failed
to identify and to evaluate Brady's disabilities in the first instance. (Id. at 11).

The School District moved to dismiss the due process complaint or in the
alternative, limit the scope of the claims in accordance with the IDEA's statute of
limitations. (Id.) The Hearing Officer convened an evidentiary hearing on August
16, 2016. (Id.) The purpose of the hearing was to determine whether the scope of
the due process complaint should be limited to the two years proceeding its filing.
(Id.) The parties presented testimony from Brady's mother and various School
District administrators and staff. (Doc. 7-2). The time period relevant to the due
process preceding spanned from the beginning of the 2011-2012 school year through
June 2014, when Parents withdrew Brady from the School District. (H.O.D. at 1;
N.T. at 50-51).

In a September 4, 2016 decision, the Hearing Officer found the "knew or
should have known" date for Parents' claim that the School District failed to
identify and to evaluate Brady's disabilities to be March 5, 2013. (H.O.D. at 15). The
Hearing Officer also found that the date of "each action" by the School District
through the end of the 2013-2014 academic year was the "knew or should have
known" date for any corresponding FAPE claim. (Id.) Applying the two-year
discovery rule set forth in G.L. v. Ligonier Valley School District Authority, 802 F.3d

601 (3d Cir. 2015), the Hearing Officer concluded that all substantive claims for compensatory education would be limited to the two year period preceding Parents' June 3, 2016 due process complaint. (H.O.D. at 10, 15; Doc. 7-15). This ruling effectively limits any substantive claims for compensatory education to the last two and one half days of the 2013-2014 school year. (H.O.D. at 15). At the request of the parties, the Hearing Officer rendered her September 4, 2016 decision a final order allowing Parents to immediately appeal. (Doc. 7-3 at 107).

### C. Procedural History

Parents filed a complaint on December 2, 2016 seeking reversal of the Hearing Officer's decision determining the "knew or should have known" dates. (Doc. 1). On April 25, 2017, Parents moved for judgment on the administrative record, (Doc. 17), and the School District moved for summary judgment, (Doc. 19). The cross-motions have been fully briefed and are ripe for disposition.[4]

## II. Legal Standard

When reviewing state administrative decisions under the IDEA, a district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the

---

[4] The School District filed a Rule 56.1 statement of undisputed material facts in support of its motion. (Doc. 21). However, district courts apply a nontraditional or "modified *de novo*" standard of review when conducting an appellate review of a state administrative decision. D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010) (emphasis added) (citations omitted); see also Shore Reg'l High Sch. Bd. of Educ. v. P.S. *ex rel.* P.S., 381 F.3d 194, 199 (3d Cir. 2004); Keystone Cent. Sch. Dist. v. E.E. *ex rel.* H.E., 438 F. Supp. 2d 519, 522 (M.D. Pa. 2006). Accordingly, the court will not consider the School District's statement (Doc. 21) or Parents' amended answer (Doc. 35) thereto in the manner contemplated by Rule 56.1. Nonetheless, the court has utilized the submissions in its independent review of the record.

preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C § 1415(i)(2)(C). The Court of Appeals for the Third Circuit has described this standard as "modified *de novo*" review under which the district court must give "due weight" to the findings of the hearing officer. P.P. *ex rel.* Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 734 (3d Cir. 2009). Pursuant to this standard, the hearing officer's factual findings should be considered *prima facie* correct; if the district court does not accept those findings, it is obligated to explain why. S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003); see also Carlisle Area Sch. v. Scott P., 62 F.3d 520, 527 (3d Cir. 1995). A district court must also accept the hearing officer's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." S.H., 336 F.3d at 270 (quoting Carlisle, 62 F.3d at 529).

A district court's review of the hearing officer's application of legal standards and conclusions of law is plenary. Jana K. *ex rel.* Tim K. v. Annville-Cleona Sch. Dist., 39 F. Supp. 3d 584, 594 (M.D. Pa. 2014) (citing Warren G. v. Cumberland Cty. Sch. Dist., 190 F.3d 80, 83 (3d Cir. 1999)). Hence, the Hearing Officer's conclusions regarding tuition reimbursement and compensatory education are subject to plenary review. P.P., 585 F.3d at 735. The reviewing court should not, however, "substitute its own notions of sound educational policy for those of local school authorities." S.H., 336 F.3d at 270 (citation omitted). Subject to the foregoing standards, the district court may make findings by a preponderance of the evidence

and grant appropriate relief, including attorneys' fees and compensatory education. D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 (3d Cir. 2010).[5]

The party challenging the appropriateness of an IEP bears the burden of persuasion at the administrative level. L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 391-92 (3d Cir. 2006) (citing Schaffer v. Weast, 546 U.S. 49 (2005)). On appeal before the district court, the burden of persuasion lies with the party challenging the administrative decision. Ridley Sch. Dist. v. M.R., 680 F.3d 260, 270 (3d Cir. 2012). In the case *sub judice*, Parents bear the burden of demonstrating that the Hearing Officer's decision was erroneous.

## III. Discussion

The IDEA requires that institutions receiving federal education funding provide a free and appropriate public education to all children with disabilities. 20 U.S.C. § 1412(a)(1)(A). The statute further mandates that all children with disabilities be "identified, located, and evaluated," regardless of the severity of their disabilities, in a manner that ensures they receive needed special education and related services. Id. § 1412(a)(3)(A). Parents may file a due process complaint asserting violations of these provisions, colloquially known as FAPE and "child find" claims respectively. Id. § 1415(b)(6)(A); P.P., 585 F.3d at 729-30.

Parents *sub judice* seek compensatory education from the School District for a series of purported failures to identify Brady's learning disabilities and to provide

---

[5] Plaintiffs challenging the adequacy of the education provided to a disabled child must fully exhaust the IDEA's administrative procedures before proceeding with claims under statutes such as the ADA and Section 504. Fry v. Napoleon Cmty. Sch., __ U.S. __, 137 S. Ct. 743, 750 (2017) (citing 20 U.S.C. § 1415(l)).

Brady with a FAPE during his second, third, and fourth grade years in violation of the IDEA. (Doc. 7-15 ¶ 20). The instant appeal concerns the threshold issue of whether Parents' claims are timely.

A.     **IDEA Discovery Rule**

The IDEA contains two statute of limitations provisions. Parents may file an administrative complaint setting forth alleged IDEA violations "that occurred not more than 2 years before the date the parent or public agency knew or should have known" about the alleged violations. 20 U.S.C. § 1415(b)(6)(B). The filing of an administrative complaint guarantees the parents the right to an impartial due process hearing, id. § 1415(f)(1)(A), and a hearing request must be made "within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint." Id. § 1415(f)(3)(C). The statute of limitations is tolled if the educational agency makes specific misrepresentations that it had resolved the problem forming the basis of the due process complaint or withholds information parents are statutorily entitled to. Id. § 1415(f)(3)(D)(i), (ii). A timely complaint, followed by a finding of liability, entitles a child to compensatory education for the entire period of the deprivation less the time reasonably required for the school district to rectify the problem. G.L., 802 F.3d at 619 (citing M.C. *ex rel.* J.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 397 (3d Cir. 1996)). An untimely complaint limits liability by barring recovery for all but the most recent two years of injury preceding the filing of the complaint. Id. at 620-21; see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 120 (2002).

The Third Circuit in <u>G.L.</u> clarified that the IDEA's statute of limitations provisions—Sections 1415(b)(6)(B) and 1415(f)(3)(C)—implement a singular IDEA statute of limitations. <u>G.L.</u>, 802 F.3d at 612. The court further held that the IDEA enacts a discovery rule. <u>Id.</u> at 613. The IDEA statute of limitations "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation—whichever comes first." <u>Id.</u> at 614 (quoting <u>Merck & Co. v. Reynolds</u>, 559 U.S. 633, 653 (2010)); <u>see also</u> 20 U.S.C. § 1415(f)(3)(C).[6]

Application of the IDEA statute of limitations is a highly factual determination that a hearing officer must make on a case-by-case basis. <u>J.L. *ex rel.* J.L. v. Ambridge Area Sch. Dist.</u>, 622 F. Supp. 2d 257, 266 (W.D. Pa. 2008) (citing 71 Fed. Reg. 46540-01 at 46704-06 (August 14, 2006) (codified at 34 C.F.R. § 300.511)); <u>see also</u> <u>Swope v. Cent. York Sch. Dist.</u>, 796 F. Supp. 2d 592, 605 (M.D. Pa. 2011). District courts within the Third Circuit applying the IDEA's discovery rule have generally focused on clear action or inaction by a school district sufficient to alert a reasonable parent that the child would not be appropriately accommodated. <u>See</u>, e.g., <u>B.B. by & through Catherine B. v. Del. Coll. Preparatory Acad.</u>, No. 16-806, 2017 WL 1862478, at *3 (D. Del. May 8, 2017); <u>Solanco Sch. Dist. v. C.H.B.</u>, No. 5:15-CV-02659, 2016 WL 4204129, at *7 & n.10 (E.D. Pa. Aug. 9, 2016); <u>Jana K</u>, 39 F. Supp. 3d at 600.

---

[6] Section 504 claims are governed by the IDEA's statute of limitations. <u>P.P.</u>, 585 F.3d at 737.

**B.**     **Application to Brady's Case**

Parents contend that the School District failed to identify all of Brady's disabilities and did not provide Brady with a FAPE during his second, third, and fourth grade years.[7] (Doc. 7-15). The Hearing Officer determined that March 5, 2013 was the "knew or should have known" date for Parents' child find and identification claims. (H.O.D. at 11, 15). The Hearing Officer did not identify a definitive "knew or should have known" date for Parents' FAPE claims. Rather, she indicated that each action or inaction by the School District following March 5, 2013 was the "knew or should have known" date for that corresponding FAPE claim. (Id.)

We conclude that the Hearing Officer correctly designated March 5, 2013 as the "knew or should have known" date for any child find and identification claims. Dr. Ingram's December 8, 2012 psychological evaluation identified Brady's significant delays in written expression secondary to the learning disability dysgraphia. (S-12 at 4-5). The report expounded on Brady's phonological dyslexia, noting that he struggled with phonics skill development which contributed to his diminished reading accuracy of narrative passages. (Id. at 5). Parents contend Dr. Ingram's evaluation did not specifically conclude Brady had a learning disability, but merely "suggest[ed] weaknesses which could be caused by a learning

_____

[7] Parents' due process complaint does not specifically invoke the IDEA's child find provision. (See Doc. 7-15). The Hearing Officer nonetheless determined the "knew or should have known" date for any potential child find and identification claims. (H.O.D. at 11). Parents do not challenge this interpretation of their due process complaint.

disability." (Doc. 18 at 10-11). However, Parents' interpretation of the December 2012 report was not reasonable after the March 5, 2013 IEP team meeting.

Dr. Ingram explained at the March 5, 2013 meeting that Brady had a *five percent chance* of becoming a competent reader and writer. (N.T. at 88). Brady's mother testified that, according to Dr. Ingram, Brady's "brain could have been rewired" had his learning challenges been identified earlier. (Id.) Principal Billet purportedly called Brady's mother after the meeting to apologize, stating that he and Dr. Molinero "couldn't believe that they had missed this." (Id. at 88-89). We find that Parents were then on notice that the School District had failed to identify all of Brady's learning disabilities *and* provide a corresponding FAPE.

Parents propose November 12, 2015 as the most reasonable "knew or should have known" date. (Doc. 18 at 18). On November 12, 2015, Dr. Kay issued her report explaining Brady's "areas of deficits." (Id.; S-13). It is beyond peradventure that Brady's academic weaknesses were known to Parents well prior to Dr. Kay's report. Brady was first evaluated in December 2005 at the age of two and a half years' old. (See S-3 at 1). Since enrolling Brady in the School District in 2009, Parents have had him evaluated privately four times in addition to the numerous evaluations and reevaluations conducted by the School District in conjunction with the IEP process. Parents' contention that they were unaware of Brady's disabilities until Dr. Kay's report is unpersuasive. Beginning with the February 2009 psychological evaluation, Parents knew Brady was at risk of developing a learning disability in written expression. (S-9 at 2). The alleged admissions by School District staff following the March 5, 2013 meeting, combined with Dr. Ingram's

diagnoses and grave characterizations of Brady's educational prospects, are sufficient to cause a reasonably diligent parent to investigate the potential injury to her child.[8] See Jana K., 39 F. Supp. 3d at 600.

Parents misapprehend application of the discovery rule to the claims *sub judice*. The discovery rule concerns the moment in time when a reasonably diligent plaintiff discovers facts that provide notice of an existing or ongoing injury. See G.L., 802 F.3d at 614 (citing Merck, 559 U.S. at 653). Parents were not required to "predict" that Brady would not improve from the Wilson instruction provided to him after the March 5, 2013 meeting. (Doc. 18 at 18; Doc. 34 at 6). Dr. Ingram clearly stated that Brady was already at serious risk of never becoming a competent reader and writer despite the specialized education he received from the School District from kindergarten through third grade. At that time, reasonably diligent parents, such as plaintiffs herein, were on notice of possible existing injury to their child *which may have also been ongoing*.

Parents challenge the Hearing Officer's determination on two related grounds. First, Parents argue that the Hearing Officer confused the labeling of a child as "learning disabled" with the actual remedy of services to address a child's

---

[8] The School District argues that Brady's mother's status as an elementary school teacher, her advanced degrees in education, and her familiarity with the special education system support the application of a higher standard in this case with regard to the "knew or should have known" date. (Doc. 20 at 13-15). The Hearing Officer briefly noted that Brady's mother's education and experience "must be a factor in the factual [knew or should have known] inquiry." (H.O.D. at 11). We disagree with the Hearing Officer's use of this *subjective* standard. The appropriate *objective* inquiry is whether a reasonably diligent plaintiff knew or should have known of the challenged action that forms the basis of the complaint. See G.L., 802 F.3d at 614 (citing Merck, 559 U.S. at 653).

learning difficulties.  (Doc. 18 at 20).  They believed Brady was receiving an appropriate remedy in the form of Wilson instruction even if his learning disabilities (dyslexia and dysgraphia) were not formally recognized.  (See id.; Doc. 30 at 13-15).  Second, Parents criticize the School District and the Hearing Officer for applying an interpretation of G.L. that forces parents to distrust school officials and to file prematurely for due process.  (See Doc. 30 at 7-9).

The IDEA contemplates cooperation between parents and schools facilitated by parents' vigilant advocacy on behalf of their child.  See G.L., 802 F.3d at 625. That same parental vigilance is "vital to the preservation and enforcement" of a child's right to special education.  Id.  A parent's dual duties to cooperate with a child's school district and investigate potential injuries to the child are not inconsistent or mutually exclusive.  See id.  In the instant matter, Parents assert that they accepted the School District's provision of Wilson instruction because the primary goal was to ensure Brady received necessary interventions.  (Doc. 30 at 5-9, 14; N.T. at 89).  Brady's mother testified that she did not seek legal advice—as she did in 2009—because the faculty involved in Brady's education were her colleagues and friends whom she trusted.  (N.T. at 89).  In light of Dr. Ingram's direct and troubling prognosis, Parents' failure to pursue potential IDEA claims was simply not reasonable.  After the March 5, 2013 meeting, Parents should have investigated potential past child find and FAPE violations contemporaneous with their ongoing efforts to secure future remedial measures from the School District for Brady.

Assuming *arguendo* that the School District's apology and remedial assurances justified Parents' belief that any IDEA violation would be cured, such

reliance was no longer reasonable after the November 8, 2013 IEP took effect. The November 2013 IEP is generally nonresponsive to Dr. Ingram's diagnoses. (See S-29). The findings of his December 2012 report, which were presented to the IEP team in March 2013, are noticeably absent from the November 2013 IEP, although administration of Wilson instruction is identified. (Id. at 18). The IEP states that Brady does not need assistive technology devices or services, yet includes a report from his classroom teacher that indicates Brady enjoys using technology and needs his iPad to accomplish long writing assignments. (Compare id. at 5 with id. at 6; see also id. at 8, 18). His mother's observations and concerns regarding Brady's struggles with reading fluency, writing, and spelling remained largely unchanged since the November 2012 IEP. (Compare S-27 at 8 with S-29 at 8). Parents continued to express concern that Brady was struggling with reading because of a learning disability—Brady's mother provided dyslexia resources to Principal Billet following the March 2013 meeting—yet the School District never independently evaluated Brady for dyslexia or dysgraphia. (P-10 at 14, 16-20; S-41 at 16, 22; N.T. at 444-45). At best, Parents' "knew or should have known" date is November 8, 2013, which would not overcome the impact of the statute of limitations.

Finally, Parents assert that the School District repeatedly misrepresented Brady's progress and withheld important information. (See Doc. 18 at 19, 22-23; Doc. 30 at 1-4, 10-11). The IDEA statute of limitations is tolled if a school district intentionally misleads or knowingly deceives parents regarding their child's progress. 20 U.S.C. § 1415(f)(3)(D)(i); D.K. v. Abington Sch. Dist., 696 F.3d 233, 246 (3d Cir. 2012). Mere optimism in reports of a child's progress is insufficient to toll

the statute of limitations.  See D.K., 696 F.3d at 245-46.  The IDEA statute of

limitations is also tolled if a school district fails to supply parents with statutorily

mandated disclosures.  20 U.S.C. § 1415(f)(3)(D)(ii); D.K., 696 F.3d at 246.  It is

undisputed that Parents failed to raise a statute of limitations defense at the

administrative stage of the case.  (H.O.D. at 10; N.T. at 43-44).  Consequently, we

conclude that Parents are barred from raising the defense now on appeal.[9]  I.H. *ex*

*rel.* D.S. v. Cumberland Valley Sch. Dist., 842 F. Supp. 2d 762, 774 (M.D. Pa. 2012)

(citing Drinker v. Colonial Sch. Dist., 888 F. Supp. 674, 679 (E.D. Pa. 1995), aff'd and

remanded *sub nom.* Drinker by Drinker v. Colonial Sch. Dist., 78 F.3d 859 (3d Cir.

1996)).

## IV.  **Conclusion**

For the foregoing reasons, the court will deny Parents' motion (Doc. 17) for

judgment on the administrative record and grant the School District's motion (Doc.

19) for summary judgment.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    March 16, 2018

---

[9] The Hearing Officer addressed Parents' assertions that the School District
did not provide sufficient information to them regarding Brady's progress.  (H.O.D.
at 12-13).  Specifically, the Hearing Officer concluded that the School District never
denied Parents access to Brady's education records and Parents had two years from
March 5, 2013 to question the School District's decision to provide Wilson and to
consider potential IDEA claims.  (Id.)